[No. 22546. *En Banc.* February 10, 1931.]

WILLIAM W. WOODCOCK *et al., Appellants,* v. E. S. MCCORD *et al., Respondents.*[1]

*Edgar C. Snyder,* for appellants.

*Kerr, McCord & Ivey* and *Cosgrove & Terhune,* for respondents McCord *et al.*

*William H. Pemberton, Roy D. Robinson,* and *Daniel Landon,* for respondent Williams.

[1]Reported in 295 Pac. 734.

MILLARD, J.—This action was brought by three of the incorporators of the O. B. Williams Company, on behalf of themselves and all others similarly situated who are entitled to acquire and hold stock in that company, to require defendants McCord and Cosgrove, as trustees under the will of O. B. Williams, deceased, to convey to that company, for a purchase price of seventy-five thousand dollars, the saw mill plant bequeathed by Williams to McCord and Cosgrove in trust for that purpose. The widow of the testator and his adopted son are residuary legatees under the will, and, for that reason, are made parties defendant in this action. Holding that the provisions of subdivision (a) of the third paragraph of the will are not mandatory, but conferred a discretion upon the trustees to sell or not to sell, the trial court sustained defendants' demurrer to the amended complaint. Refusing to plead further, judgment of dismissal was rendered against the plaintiffs, who have appealed from that judgment.

The facts, summarized from the allegations of the complaint and the exhibits made a part thereof, are as follows:

On June 14, 1921, and for many years prior thereto, O. B. Williams owned and operated in Seattle a sawmill plant, in the operation of which the appellants and others were then and had been employed for several years. He also owned other property of considerable value in Seattle. On that day, he duly executed his last will and testament. By the first paragraph of the will, the testator revoked all former wills made by him. By the second paragraph of the will, Williams devised and bequeathed to his wife the residence property in which they lived, the household furniture therein, and the proceeds of certain life insurance policies. The third paragraph of the will, in so far as pertinent to this appeal, reads as follows:

"I give, devise and bequeath unto E. S. McCord and Howard Cosgrove, both of Seattle, Washington, all the rest and residue and remainder of my property, real, personal and mixed, of whatsoever nature and wheresoever situate, for the following purposes and uses and upon the following trusts, to-wit:

"(a) I suggest that my said Trustees, as soon after my death as convenient, sell and dispose of my stock of merchandise, mill and mill plant, to a corporation to be organized by my employees, and that such corporation pay for such business, including the good will, the sum of Seventy-five Thousand Dollars ($75,000) and that it be sold to such corporation on liberal terms as to time, but that at least ten thousand dollars ($10,000) should be made payable within one year from the date of sale; and at least Seventy-five Hundred Dollars ($7500) be paid each year thereafter until the full amount of the purchase price shall have been paid. Deferred payments should bear interest at the rate of six per cent (6%) per annum, and no dividends to be declared by such corporation until the full sum of seventy-five thousand dollars has been paid. Insurance in the sum of at least Twenty Thousand Dollars ($20,-000) should be carried on the mill and the stock. A rental of not less than Four Hundred Dollars ($400) per month, together with all taxes and assessments on the property at No. 1943 First Avenue South should be paid by the corporation, and a rental of One Hundred Twenty-five Dollars ($125) per month, together with all taxes and assessments upon the mill site at Sixth Avenue South and Henrietta Street, Seattle, Washington; And I suggest that all employes who have been in my employment for five years and longer should hold. stock in such corporation, should they so desire, and that heads of departments should have larger holdings of stock in such corporation, the amounts of stock to be held by the various stockholders to be determined by my Trustees. And such corporation should not be permitted to go into debt for any sum larger than the indebtedness of the O. B. Williams Company at the time of my death. All the provisions

of this sub-division of my Will in regard to the formation of such corporation and the purchase of said business, merchandise and other property and in fact, all of the provisions of this sub-division, are not mandatory upon my Trustees, but are merely a suggestion as a basis for working out a plan by which said business can be handled advantageously.

"(b) To hold, manage, control, sell and convey any or all of my property, for such price, upon such terms and to such persons or person as to my said Trustees may seem expedient, the purchasers not to be required to see to the application of the purchase money."

By subdivision (c) of the third paragraph of the will, special bequests aggregating one hundred and nine thousand dollars are made to his wife, adopted son and others. By subdivision (d) of the third paragraph the adopted son and widow are made residuary legatees. The fourth paragraph of the will appoints respondents McCord and Cosgrove executors of the will, directs that no bonds be required of them as executors or as trustees, and directs the settlement of the estate by them without interference by the courts, in so far as the law permits. The fifth paragraph of the will specifies the compensation payable to McCord and Cosgrove as executors and trustees.

The success of the business of O. B. Williams was largely due to the loyalty and cooperation of his employees. This fact was recognized and frequently acknowledged by Williams, upon whose promise to take care of them the employees relied and were thereby induced to remain in the employ of Williams, at less wages than they might have received elsewhere. For the purpose of fulfilling his promises to his employees, Williams, for a long time prior to his death, had under consideration the formation of some form of corporation or organization under which all the older employees of the Williams Company should have a direct financial

interest. Pending the formation of such cooperative organization for the carrying out of his purpose, and in order to provide against the contingency of his death, Williams, shortly before being stricken by a serious illness, made his will June 14, 1921, as above recited. He instructed his attorney to prepare the will ''in such legal wording as would effectuate the purposes he had in mind.''

''That some of the words used by said McCord in preparing said form were ineptly chosen for the expression of the testator's will, and are calculated to lend themselves to uncertainty and delay, but that, notwithstanding this, the will shows that it was the unmistakable purpose of the said O. B. Williams that his employees (having served five years or more) should as a group be the principal beneficiaries under his will, aside from liberal provisions expressly made for his widow and adopted son, and that such was in fact his intent, purpose and determination in the making of said will.''

On May 15, 1924, O. B. Williams died, leaving the will above mentioned. He had owned and operated the mill plant mentioned in the will up to the time of his death. Appellants Woodcock, Goodnough and Schroeder were then, and had been for more than five years, employees of Williams in the operation of the mill. On May 22, 1924, the will was duly admitted to probate in the superior court for King county, and the appointment of McCord and Cosgrove as executors thereunder confirmed by the court. Thereupon, they entered upon their duties as executors and trustees. They are still acting in that behalf, but have not sold or disposed of the mill plant, as provided by the third paragraph of the will.

On June 5, 1928, fourteen of the employees of the plant, including appellants, eligible to hold stock in a corporation such as is by the will suggested as a pros-

pective purchaser of the plant, executed articles forming such a corporation, and duly filed the articles with the secretary of state, as required by the statute for the organization of such a corporation. These fourteen employees constituted a majority of the employees of the plant at the time of the death of Williams and at the time of the execution of the articles of incorporation.

McCord and Cosgrove, as executors and trustees, have received in their hands belonging to the trust, at least one hundred and forty thousand dollars. The one hundred and nine thousand dollars in special bequests, above mentioned, together with all the debts and expenses of administration chargeable against the estate or trust property, aggregate less than one hundred and twenty-five thousand dollars.

Appellants have arranged to raise the necessary funds to pay the suggested purchase price of seventy-five thousand dollars for the plant, and will be able within a reasonable time after the rendering of a judgment of the court in this action adjudicating their rights in that behalf, to cause the corporation to consummate such purchase. The prayer of the complaint is for judgment of the court looking to that end.

Respondent trustees concede that, by the will, they are directed to sell the mill plant to a corporation to be composed of the former employees of O. B. Williams, but contend that the mill plant does not include the land on which the mill is situated; that, by the terms of the will the corporation is required to pay a definite rental for the use of the real estate, and is also required to pay all taxes and assessments levied against the real estate. The trustees also insist that they are vested by the will with a discretion as to the time in which they shall sell the plant to the corporation.

We are mindful of the rule that, if the language in the will plainly and unambiguously expresses the intention of the testator, extrinsic evidence is not admissible to show an intention different from that expressed in the will.

. What was the intention of the testator? Williams induced appellants and others to remain in his employ by promising them an interest in the plant. To effectuate that purpose, Williams provided, by the third paragraph of his will, for the sale of the plant to a corporation to be composed of his former employees. That the testator intended to sell the mill plant to his employees, if they desired to buy same, not only stands admitted, but is clearly shown by the third paragraph of the will. The testator left to the discretion of the trustees the method and manner of disposition of the estate, and the formation of the corporation for the employees. The provisions as to payment of rental and the charging of the corporation with the payment of taxes and assessments levied against the real estate, are ambiguous. Is the corporation to continue to pay rental thereon indefinitely, or does the corporation take the plant, including the realty, free of rental after the seventy-five thousand dollars is paid?

What is included in the term "mill plant?" The will is plain that the testator intended that his employees should become owners of the mill plant on certain conditions, but the conditions are not clearly specified. There is doubt as to the extent of the gift intended from the expressions used in the will, hence parol evidence is admissible to ascertain the intent of the testator.

" . . . all of the provisions of this subdivision are not mandatory upon my trustees, but are merely a suggestion as a basis for working out a plan by which said business can be handled advantageously."

"Advantageously" to whom? The testator has shown, by the language preceding that provision, what he has in mind—a plan for the acquisition of the plant by his employees. The testator did not know whether the men would accept his offer. The testator may have contemplated—that he was a man of considerable business experience is evidenced by the size of his estate— that, subsequent to his death, conditions would make the plan he outlined impracticable; therefore, in order that his trustees might not be hampered, and that his main purpose might be effectuated, he imposed upon his trustees the duty, and vested them with the power, to evolve a plan more advantageous to his employees and to the other beneficiaries under the will. While the trustees were vested with a large discretion, that discretion must be reasonably exercised, and exercised within a reasonable time.

The complaint is sufficient as against the general demurrer. The ambiguities present a situation that necessitates consideration of, and renders admissible, extrinsic evidence to ascertain the intent of the testator as to the conditions under which the employees are to acquire the mill plant, and the extent of that gift.

The judgment is reversed and the cause remanded, with directions to the trial court to overrule the demurrer. To the end that one trial may result in the distribution of the estate, the trial court is also directed to require the trustees to submit, by cross-complaint or by answer, their construction of the will and their plan for carrying out the intention of the testator as interpreted by them.

TOLMAN, C. J., BEELER, and MITCHELL, JJ., concur.
BEALS, J., concurs in the result.

PARKER, J. (dissenting)—I dissent. It is contended in behalf of appellants that a precatory trust is created

by the language of this will, in favor of them and their co-employees of the deceased; that is, while the language of subdivision (a) of the third paragraph of the will is not, as to the sale of the plant to a corporation to be organized by the employees, mandatory in form, it is so in legal effect. If the introductory words of that subdivision,

"I suggest that my said trustees, as soon after my death as convenient, sell and dispose of my stock of merchandise, mill and mill plant, to a corporation to be organized by my employees,"

for the sum of seventy-five thousand dollars, stood unqualified by other language therein, there might be some basis upon which to rest this contention. But the mandatory nature which might be so attributed to that language is, I think, clearly negatived by the concluding language of that subdivision:

"All the provisions of this subdivision of my will in regard to the formation of such corporation and the purchase of said business, merchandise and other property, and, in fact, all of the provisions of this subdivision, are not mandatory upon my trustees, but are merely a suggestion as a basis for working out a plan by which said business can be handled advantageously."

In the early case of *Hunt v. Hunt,* 18 Wash. 14, 50 Pac. 578, Judge Reavis, speaking for the court, made this general observation, and I think correctly, touching the creation of precatory trusts by language in wills other than in express terms:

"A precatory trust arises out of words of 'entreaty, wish, expectation, request or recommendation, frequently employed in wills,' and a trust has been created by such words as 'hope,' 'wish,' 'request,' etc., if they be not so modified by the context as to amount to no more than mere suggestions to be acted upon or not according to the caprice of the interested devisee, or

negatived by other expressions indicating a contrary intention, and the subject and object be sufficiently certain.''

In the late case of *In re Hochbrunn's Estate,* 138 Wash. 415, 244 Pac. 698, there was involved language in a will which, we held, created a precatory trust. The testator by his will gave a large amount of property to a named brother, ''with the special request to my said brother'' to pay therefrom ten thousand dollars to a named sister ''as soon as possible after my decease;'' this request being wholly unqualified by any other language in the will. We held that there was thereby created a precatory trust, to be so executed by the brother devisee in favor of the sister; but we there recognized the correctness of the holding in *Hunt v. Hunt, supra,* and similar cases, by this language:

'' . . . upon an examination of which [those cases] it will be found that the language employed in the instruments under consideration was mediately or immediately used in connection with other inconsistent and more dominating provisions of the instruments.''

In the following cases the language in each of the wills claimed to be sufficient to create a precatory trust in the devisee, which language, standing unqualified, was apparently sufficient to that end, was accompanied by express language negativing any such intention upon the part of the testator; and, for that reason, it was held that no such trust was created: *Bacon v. Ransom,* 139 Mass. 117, 29 N. E. 473; *George v. George,* 186 Mass. 75, 71 N. E. 85; *Enders' Ex'r v. Tasco,* 89 Ky. 17, 11 S. W. 818; *In re Keleman,* 126 N. Y. 73, 26 N. E. 968; *Tabor v. Tabor,* 85 Wis. 313, 55 N. W. 702; *Fellowes v. Durfey,* 163 N. C. 305, 79 S. E. 621; *In re Purcell's Estate,* 167 Cal. 176, 138 Pac. 704. In the text of

40 Cyc. 1736, referring to testamentary expressions such as hope, wish, request, etc., we read:

"The question in every case is whether they express merely the testator's wish, or whether they express his will. A trust is created if it clearly appears that the words were used in an imperative sense; but this only where the testator's desires can be ascertained with reasonable certainty, the subject and the object being clear. Sometimes the testator explicitly states the sense in which precatory words are used, and in such case of course his express intention governs."

I am of the opinion that the words "I suggest," used in this will by Williams, the testator, should not be held mandatory in meaning, accompanied as they are by the express statement that they "are not mandatory;" and that appellants have not stated in their complaint facts constituting legal cause for compelling the executors and trustees to sell to the corporation the mill and mill plant, as prayed for.

. HOLCOMB, MAIN, and FULLERTON, JJ., concur with PARKER, J.