In re SMITH'S ESTATE.

DAVIES v. SMITH et al.

No. 6794.   Decided September 28, 1945.   (162 P. 2d 105.)

538

540

See 33 C. J. S., Executors and Administrators, sec. 297; 21 Am.
Jur., 545.

*A. C. Melville,* of Salt Lake City, and *M. A. Melville,* of Fillmore, for appellant.

*B. C. Call,* of Brigham City, for respondents.

WOLFE, Justice.

William B. Davies, executor of the estate of Elias M. Smith, deceased, filed his second and third accounts with the probate court. Objections were filed to various items in each account by four of the ten heirs. After hearing the court disallowed substantial portions of each account; charged the executor with various items not contained in either account; and allowed as a charge against the estate amounts totalling $608.52 representing witness fees, attorney's fees and expenses incurred by the objectors. From this judgment William B. Davies has appealed both personally and as executor of the estate.

Elias M. Smith died October 22, 1937, leaving an estate consisting principally of two farms. These farms were located near the Nevada State line, about 165 miles west of Fillmore, the county seat of Millard County. By the terms of the will, William B. Davies, son-in-law to the deceased, was named to act as executor without bond. He was directed to:

"rent or operate my main ranch at Garrison, Utah (at present consisting of 160 acres) and sell the estate's share of the crop, after retaining enough for feed and seed, and after paying taxes, insurance and other essential expenses of ranch (including taxes and insurance on my present home or house and four acres) shall turn over to my wife, Mary H. Smith these net proceeds of the ranch for her own personal needs."

The will was duly admitted to probate and on November 22, 1937, Davies qualified as executor and letters testamentary issued. He undertook the performance of his duties and operated the 160 acre farm. Although Section 102-11-32, Revised Statutes of Utah 1933, now Sec. 102-11-32, U. C. A. 1943, required him to do so within six months after appoint-

ment as executor, Davies filed no account until October 2, 1941.

Mary H. Smith was deceased by this time. This first account reflected various receipts and expenditures covering a period from November, 1937, to August 31, 1941. No objections were filed to this first account and it was approved by the court on October 14, 1941.

The second account was filed on November 18, 1943, and the third on June 5, 1944. The objections filed went substantially to all of the items in both accounts. The items disallowed relate primarily to the operation of the 160 acre farm.

The executor in his individual capacity owned a ranch in the immediate vicinity of the estate farms. He operated with his brother, a large number of cattle and had some grazing permits on the public domain. His operation of the estate lands was closely allied with the operation of his own lands. He, without court approval, leased the estate's farm to himself in 1938, 1939 and 1940. During other years he personally purchased the produce from the estate's farm. He purchased lumber for the purpose of building feed racks on the estate's farm and then used those racks in the feeding of his own livestock. When the farm was leased to third persons he failed to get court approval of the lease. Men hired to work on the estate's farm were also during substantially the same period, employed by him to work on his own lands. He had considerable difficulty separating his own private operations from those of the estate. The books and records kept were incomplete. Many of the claimed expenditures were not supported by vouchers. Canceled checks, presented in support of expenditures, were signed by the executor as such, by himself individually and by his brother and partner, Elmer Davies. Many of them contained no notations definitely to identify them with expenditures on behalf of the estate. The record does not show that the executor was guilty of overreaching in his dealings with the estate, but it does show that he thoroughly mixed his own personal business with that of the estate. It also

clearly shows that he had numerous dealings with the estate
in which he either leased estate lands or purchased estate
property without in any instance getting the court's per-
mission or approval. The segregation of these various items
from the executor's individual business presented the Pro-
bate Division of the District Court with a difficult problem.

Before proceeding to consider some of the items disallowed,
the applicable statutes should be noted. Sections
102-10-2 and 102-10-5, U. C. A. 1943, provide for
the confirmation by the court of all sales of estate
property. Section 102-10-8, U. C. A. 1943, provides that:

"No executor or administrator shall, directly or indirectly, pur-
chase any property of the estate he represents, nor be interested in
any sale."

Section 102-10-35 governs the leasing of estate lands.
Though the will directed the executor either to operate the
lands himself as executor or to lease them, the executor was
required by this section to procure court approval of the
terms of the lease. None of the above statutes were complied
with.

Because of the many irregularities and the commingling
of estate business with that of the executor, the trial court
was confronted by a situation where not great sums were
involved but the factual issues presented might have
consumed expense and time quite disproportionate
to the amounts involved if utmost certainty as to
minor factual matters was sought. These very issues arose
because of the slipshod and confused administration. The
executor is hardly in position to complain if, under such
circumstances, the court by practical if somewhat rough
approximations attempted to reach an equitable result with-
out going into all the niceties of the case. The situation was
of his own making. The substance of the estate could have
been consumed in days of trial made necessary by faulty
administration.

Items Nos. 1 to 14 in the disbursement column of the
second account all relate to the expenses incurred in the

operation of the farm. The executor claimed that he spent $100 to do the fall plowing in 1941 and $150 to have manure hauled onto the estate lands in the fall and winter of 1940-41. After expending these sums the executor made a lease or crop sharing agreement with Chester Hornback and Jim Gray. Under this agreement the so-called lessees got the benefit of the $250 work mentioned above. In addition the estate was bound to pay them $40 per month for six months; give them one-fourth of the crops, furnish all of the seed, rent additional water for irrigation purposes, furnish the tools and machinery, hire any additional help needed in the operation of the farm and the executor personally was to furnish the horses needed in operating the farm. The executor's account shows that the operation of the farm under this arrangement resulted in a net loss to the estate for the year of 1941. The court disallowed all items of expenditures connected with the operation of the farm under this arrangement on the grounds that either no lease was made or if made that it was improvident and would not have been approved by the court.

The court treated the matter as though the executor had failed to make any lease with Hornback and Gray. It charged him with the reasonable rental value of the farm ($600) as if he had leased the farm to himself. The executor was permitted to keep all of the receipts from the operation of the farm in 1941 and all expeditures in operating the farm were disallowed. It was reasonable to find that an arrangement such as that outlined by the executor would not have received court approval had it been presented. The handling of the estate farm in 1941 was further complicated by the fact that the executor in his individual capacity purchased all of the crops produced on the farm. The purchase of the crops by the executor was in direct violation of Section 102-10-8. The lease or crop sharing arrangement was, insofar as the estate was concerned, improvident. The executor can hardly complain of the ruling of the court in charging the executor with what it found to be a reasonable rental value of the farm

and letting him keep all receipts and stand all expenditures in the operation of the farm.

The rental price fixed ($600) seems to be in line with the amounts previously paid by the executor when he actually leased it. His first account shows that he paid $700 in 1938 and $600 in each of the years 1939 and 1940. In 1942 the place was leased to Young Brothers for $600. The contention that there was no evidence to show that $600 was reasonable rental for 1941 is without merit. The holding of the court in this regard was not error.

Items 15 and 16 of the second account were $9.60 for "48 posts for upkeep of the premises" and $14 to "Chester Hornback for wire for premises," both obtained during the fall of 1940. The court disallowed both items under the general ruling on items Nos. 1 to 14 discussed above. It is argued that these were for capital improvements and that these two items should have been allowed even though it was held that the executor was, as an individual, considered by the court to be the lessee of the property at that time. The evidence does not so show. Since he failed to get approval from the court for capital improvements, the burden should be on him to show that they were for the benefit of the estate. In *re Hanson's Estate*, 55 Utah 23, 184 P. 197.

The only other item disallowed in the second account was item No. 17, for $3 paid to the executor's daughter for posting the executor's account books. Under Section 102-11-35, U. C. A. 1943, items in the account representing expenditures not exceeding $20 in amount, though not supported by voucher, can be allowed upon the "uncontradicted oath" of the executor "positive to the fact of payment." This provision does not require the trial court to allow every item which the executor testifies that he paid. It merely permits the court to make such an allowance. It provides for the allowance for expenditures made, unsupported by voucher, only upon "uncontradited oath positive to * * * payment." While the executor did positively testify that he kept books and paid this

amount to his daughter, he failed at any time to produce any books although the necessity of having such books in court was constantly demonstrated throughout the trial. His failure to produce the books considerably weakens his testimony in this regard. In view of the executor's failure to produce any books we will not hold that as a matter of law the expenditure was prudent.

## Third Account

Regarding receipts—The court charged the executor with the receipt of $95.40 which was due but never collected. It was owing to the estate by Young Brothers on a lease. The charge against the executor was made because of his failure to collect this money from Young Brothers. The record was silent as to whether the item was collectible. No testimony was adduced to show what efforts had been made to collect it. The court took the stand that since the crops were located on the lands, the executor was negligent in not collecting the lease money before permitting the removal of the crops. In the absence of evidence to show whether or not indebtedness was collectible, the court assumed that it could have been collected and that the item should be charged against the executor for his failure to collect. The question is whether or not the court erred in assuming, in the absence of any evidence, that the debt could have been collected.

Section 102-11-23, U. C. A. 1943, relates to this matter. It provides that: 9, 10

"No executor or administrator is accountable. for any debts due the decedent, if it appears that they remain uncollected without his fault."

This section was copied. from Section 1615 of the California Code of Civil Procedure. The implication from the language used is that unless it is made to appear that the debts remain uncollected without the executor's fault, he should be made to account for them. The presumption, in

the absence of a showing to the contrary, is that the debts could have been collected. See *In re Sanderson's Estate,* 74 Cal. 199, 15 P. 753; *In re Loheide's Estate,* 17 Cal. App. 475, 120 P. 56; *Pratt* v. *Pratt,* 43 Cal. App. 261, 184 P. 956, at page 962; Bancroft, Probate Practice, Sec. 349, p. 666. The general rule is stated in Bancroft, supra, as follows:

"It is sometimes provided that an executor or administrator is not accountable for uncollected debts due to the decedent if it appears that they remain uncollected without his fault. Even under such a statute, however, the representative has the burden of excusing his failure to collect * * *. The presumption, in the absence of a showing to the contrary, at least by his own averment, is that he could have collected."

It therefore appears that in the absence of any showing why the debt had not been collected, the administrator was correctly charged with this item of $95.40 uncollected from the Young Brothers.

The next assignments of error relate to the claims for traveling expenses. The executor in items 6 to 8 and item 22 claimed 20 cents per mile (one way) for the traveling expenses for trips made in connection with the administration of the estate. In item 23 a claim is made for 20 cents per mile (one way) for traveling expenses for the executor's attorneys. The trial court reduced this claimed amount to five cents per mile each way. The general rule is that necessary traveling expenses of both the executor and his attorneys are allowable. It is also held that an executor living at some distance from the county seat may properly claim expenses incurred in living away from home in attending to estate business. See Bancroft, Probate Practice, p. 1648. It would also appear that such items of expense would be allowable under Section 102-11-24, U. C. A. 1943.

Here the executor lived 165 miles from the county seat. The roads were poor and in order to attend court at 10:00 a. m. it was necessary for him to arrive at the county seat the night before. Some of the hearings lasted two or three days. He therefore necessarily had expenses of living

away from home. He made no claim for these expenses. He also testified that he traveled 24 miles round trip from his home to the estate farm on numerous occasions without making any claim for traveling expenses. There was no evidence that the amount claimed was not reasonable, nor was it contended that the trips were unnecessary. The court, taking into account that judges were allowed only five cents per mile by the state for travel expenses, reduced the amount allowed to five cents per mile.

The amount claimed (20 cents per mile one way) is the amount expressly allowed by Section 28-5-1, U. C. A. 1943, for jurors, and Section 28-5-4, U. C. A. 1943, for witnesses. In the absence of any testimony to the effect that the amount claimed was unreasonable, it is extremely doubtful that the court could arbitrarily reduce this item below the level apparently approved as reasonable by the legislature for witnesses and jurors. But when we consider the further fact that the executor here made it plain that he was including in this item his living expenses while away from home, it can be definitely said that the court was arbitrary in reducing the amount without at the same time indicating that no consideration was given to the other living expenses, so that the executor could make a separate claim for such expenses. The court allowed the objectors various expenses, in addition to travel expenses, for attending the trial. The same treatment should certainly have been allowed to the executor. Under these circumstances it must be held that the court erred in reducing the amount claimed by the executor for traveling expenses for himself and his attorneys.

Items 9 and 10 in the third account are for traveling expenses for the executor in attending hearings in Fillmore. The court found that these hearings were made necessary solely because of the slipshod method of administration. It therefore disallowed these items in toto. It appears that the finding that these hearings were made necessary by negligent administration of the estate is supported by the evidence. It is proper that the executor

be made to stand such expenses. The same ruling was made as to items 13 and 14, representing payments to witnesses for attending hearings in Fillmore. These expenditures were properly disallowed. Items Nos. 25 and 26 were for witness fees and traveling expenses paid to one Chester Hornback who appeared as a witness on behalf of the estate. These items were disallowed, not because the testimony was made necessary by reason of faulty administration, but because the witness did not have first hand knowledge of the matters upon which he was called to testify. The court might have been justified in disallowing these items on the same basis as the disallowance of items 13 and 14. But if Hornback was called in good faith by the executor he would have been entitled to traveling expenses and a witness fee even though he was not called to the witness stand. On the basis of the record made by the trial court, the witness fees and traveling expenses for Hornback should have been allowed.

The next item in the account, which was disallowed in part, was the claim of the executor for double compensation for his services as executor. This claim was based on Section 102-11-25, U. C. A. 1943, which in part provides that extra compensation may be allowed

"as the court may deem just and reasonable for any extraordinary services."

The matter, of necessity, is thus left largely to the discretion of the trial court. Its ruling will not be disturbed except for a clear abuse of discretion. See Bancroft, Probate Practice, p. 790. The executor here had the duty under the will of operating the farm for many years. It presents a case where extra compensation might have been justified had not there been so many irregularities in the administration of the estate. While there is no evidence of fraud or dishonesty on the part of the executor, he did not keep his accounts in order. His many dealings in which he bought estate property for his individual benefit in violation of statute and without even attempting to get court approval was highly irregular. His own personal busines

enterprises were co-mingled with the business of the estate to too great an extent. The court was fully justified in refusing extra compensation. See generally the annotation in 83 A. L. R. 726

"Right of executor or administrator to commission as affected by faults in administration."

Item 24 relates to the attorneys' fee to be allowed to the attorneys for the executor. The executor asked for a total of $750 for the attorneys. The court allowed a total of $500. It is urged that the court was arbitrary in allowing only the latter amount. The only evidence ▮▮▮▮ introduced concerning the reasonableness of attorneys' fees was to the effect that $750 would be reasonable. Section 102-11-24, U. C. A. 1943, provides for the allowance of reasonable attorneys' fee. The contention on this appeal is that the trial court was required to follow the uncontradicted evidence as to what fee would be reasonable. The trial court is not required to follow the uncontradicted evidence in this regard. What would constitute a reasonable fee in a given case is a matter which is to a large extent within the peculiar knowledge of the trial court. It knows the value of the estate, the nature of the work, the time spent by counsel, the nature of the services rendered, etc. In the absence of the abuse of sound discretion, the decision of the trial court will be affirmed. See *In re Nolan's Estate*, 56 Ariz. 366, 108 P. 2d 391; Bancroft, Probate Practice, p. 810. The matter of reasonableness of attorney's fees is covered by an exhaustive annotation in 143 A. L. R. 672-967. The various elements to be considered are discussed in detail and numerous cases from many jurisdictions are cited and discussed. See page 676-726. Fees allowed in the administration of decedent's estates are covered at page 735 ff. Under the cases there cited it cannot be held that the trial court abused its discretion in allowing only $500 as attorneys' fees in this case.

This brings us to the last group of items. The trial court allowed as an expense against the estate various items of

expenses and costs incurred by the objectors to the second and third accounts. These items consist of (1) attorney's fees to the attorney for the objectors; (2) witness fees and mileage for witnesses for the objectors; and (3) expenses in attending court for the objectors themselves. The appellant contends that none of these items should have been allowed as charges against the estate.

No authorities are cited by either appellant or respondents concerning the legal principles governing the allowance of such items of expense against the estate. In fact very little research has been done by counsel on any of the points raised on this appeal. There is no statute which expressly authorizes the allowance of attorney fees and items of cost incurred by the heirs in objecting to certain items in the account. The general rule undoubtedly is that

"no allowance may be made out of the estate for the services of an attorney not employed by the personal representative of the estate, where the services were rendered for the sole benefit of an individual or group of individuals interested in the estate." 79 A. L. R. 522.

There is authority to the effect that the reasonable value of services rendered by an attorney in contesting the account of the personal representatives is chargeable against the estate. See 79 A. L. R. 522, 533. Apparently, however, the services must result in a substantial benefit to the estate. This matter is discussed in *State* v. *Underwood*, 54 Wyo. 1, 86 P. 2d 707; *In re Hamilton's Estate*, 96 Mont. 551, 33 P. 2d 2558; *In re Mundt's Estate*, 169 Wash. 593, 14 P. 2d 59; *In re Williams' Estate*, 167 Wash. 524, 10 P. 2d 219.

Here the amount of allowances against the estate almost exceed the savings effected by the objections to the account. The allowance by the trial court of $6 per day to each of the objectors' witnesses for attending court was unwarranted. The statute, Section 28-5-4, U. C. A. 1943, sets the legal fee to be paid witnesses at $3 per day. None of the objectors' witnesses were entitled to more.

The allowance of $300 to the attorney for the objectors

appears very liberal in view of the amount of net savings effected by the contest. Since, however, there was a net savings which resulted to all of the estate and not merely to the individual heirs objecting to the accounts, the allowance of a fee for the objectors' attorney appears proper. The amount allowed to the attorney was reasonable for the amount of work done and the time expended by him. The doubt is only as to whether the total amount should have been allowed as a charge against the estate. Since the benefit gained inured to the benefit of all the heirs, it is, under the last cited cases, proper to allow these items of costs against the estate. The amount allowed for witness fees ($6) is reduced to the statutory amount ($3). In other respects the allowances against the estate of the various items of expense incurred by the objectors is affirmed, including a $3 per day witness fee to each objector who appeared and testified.

Subject to the above modifications the judgment is affirmed. The costs on appeal of both the appellant and respondents shall be allowed against the estate.

LARSON, C. J., and McDONOUGH, TURNER, and WADE, JJ., concur.